UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRUCE HAY<br><br>                Plaintiff,<br><br>v.<br><br>THE GERNERT COMPANY, INC., and SARAH BURNES,<br><br>                Defendants. | Civil Action No. 1:22-cv-698<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

## PRELIMINARY STATEMENT

1. This is a diversity action based on breach of fiduciary duty.

2. Over the past decade, the digital revolution has eroded earnings throughout much of the publishing industry. Newsrooms have sustained mass layoffs; magazines and publishing houses have shut down; sales of books, in both print and electronic formats, have stagnated. Between 2009 and 2019 the average advances and royalties paid to book authors fell by some 30 percent. (See Léon, Does It Pay to Be a Writer? N.Y. Times, January 5, 2019.)

3. During this same period, publishers have come to rely on sensational "blockbusters" to make money. According to prominent literary agent David Gernert, the book market is increasingly dominated by the "brand-name bestseller," with the result that "the rich

1

get richer and everybody else goes about their business." (Quoted in Gamerman, The Year of the Blockbuster Novel, Wall St. Journal, May 28, 2017.)

4. This precarious, winner-take-all environment has tempted some in the publishing industry to cut legal and ethical corners in pursuit of the next bestseller. The present case arises out of the decision of Gernert's own agency, known as the Gernert Company ("TGC") – together with its agent Sarah Burnes ("Burnes") to succumb to that temptation.

5. Defendant Sarah Burnes, a literary agent, on behalf of Defendant The Gernert Company ("TGC"), a literary agency, entered into an agreement with Plaintiff Bruce Hay to negotiate book, television and film deals on his behalf with regard to previously written articles the major subject of which was Mr. Hay's life.

6. Ms. Burnes, on behalf of TGC, then negotiated deals with HarperCollins Publishers LLC that cut out Mr. Hay entirely, breaching the fiduciary duties of Ms. Burnes and TGC to Mr. Hay.

7. The Defendants also negotiated deals regarding depictions of Mr. Hay and Mr. Hay's life without his permission in violation of New York Civil Rights Law § 50.

## PARTIES

8. Bruce Hay is an individual and a citizen of Massachusetts. He was a professor at Harvard Law School during times relevant to this action

9. TGC is a New York corporation in business as a literary agency, whose principal place of business is New York, New York.

10. Sarah Burnes is an individual and a citizen of New York. She is an agent at the Gernert Company, where she has been employed since 2005.

## JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), because the Plaintiff's citizenship at the time of filing was diverse from that of each Defendant, and because the amount in controversy exceeds $75,000.

12. Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred in the Southern District of New York.

## FACTS

13. Defendant TGC is a literary agency that partners with subagents in the film/TV industry.

14. Defendant Sarah Burnes is a literary agent and principal of TGC.

15. Plaintiff Bruce Hay was a professor at Harvard Law School, who was the subject of articles published in New York Magazine in July 2019.

16. The articles concerned Mr. Hay's conflict with two formerly close friends: Maria-Pia Shuman, a cisgender white woman, and her spouse Mischa Shuman, a transgender woman of color ("the Shumans").

17. They were drawn into legal conflict in 2017. Mr. Hay was contacted by individuals with a grudge against the Shumans, and their lawyers, who intentionally misled him to believe the Shumans were committing fraud.

18. In June 2018, Mr. Hay first described the situation to his acquaintance Kera Bolonik ("Ms. Bolonik"), a freelance writer and part-time employee at *New York* Magazine.

19. Ms. Bolonik wrote two articles regarding Plaintiff's life in New York Magazine in July and August of 2019.

20. Ms. Bolonik subjected Mr. Hay to sexual harassment during the course of his working with her on the articles, and TGC was on notice of this but took no action.

21. In December 2019, Ms. Burnes agreed with Plaintiff to negotiate the sale of Plaintiff's life rights to a movie or television producer in exchange for his consent to a Life Rights Agreement for the use rights of his life story by TGC.

22. Ms. Burnes told him that she was partnering with Gernert's subagent United Talent Agency for purposes of his representation.

23. In late 2019, after the articles were already published, Mr. Hay began to realize that several persons with a grudge against the Shumans and their attorneys had manipulated him into fueling pseudological stories about them.

24. Several men, claiming to be the victims of the Shumans' alleged fraud, had, in fact, victimized the Shumans. In order to avoid the legal consequences, they falsely accused the Shumans of criminal misbehavior. They and their lawyers provided false and selective evidence to Mr. Hay to encourage him to also accuse the Shumans of wrongdoing.

25. The articles were published in July and August 2019. In April 2020, Mr. Hay contacted Ms. Bolonik and her publisher, New York Media LLC, about the evidence he had received about the issue. He wrote to New York Magazine through July 2020, when he filed his lawsuit against New York Magazine requesting them to remove the articles, but the publisher continued to publish them by allowing them to remain online.

26. As soon as the first article was published in July 2019, Ms. Bolonik and Ms. Burnes began receiving inquiries from movie and television producers and began soliciting media deals as well because they did not receive as many inquiries as they had hoped.

27. In telephone conversations with Mr. Hay in the days after the article was

published, Ms. Bolonik said the following to him with the encouragement and approval of Ms. Burnes: (1) that Ms. Burnes had informed her that a Hollywood production would require the joint participation of Ms. Bolonik (as author) and Plaintiff (as a person being portrayed); (2) that Ms. Burnes had expressed interest in helping them jointly negotiate the deal; (3) that Ms. Burnes proposed working with United Talent Agents (UTA), with whom Gernert had a longstanding "affiliation"; and (4) that Ms. Burnes promised that Gernert and UTA would make a great "team" for negotiating the best possible deal for Mr. Hay and Ms. Bolonik.

28. Ms. Burnes intended this to mean she and her agency, Defendant TGC, for which she held ostensible authority, offered to represent Mr. Hay and Ms. Bolonik with regard to TV/film negotiations.

29. Mr. Hay understood from this that Ms. Burnes, on behalf of TGC, was offering to represent him in regard to film/TV negotiations.

30. Shortly afterward, Ms. Bolonik sent an email to Mr. Hay and Ms. Burnes, with the purpose of beginning discussions about managing the film/TV rights with Jason Richman and Addison Duffy of United Talent Agents, introducing Mr. Hay to the UTA team.

31. Ms. Duffy responded by email, requesting that Mr. Hay participate in a conference call with Ms. Burnes and others regarding TV/film rights in order to "help manage this space on your and Kera's behalf."

32. Ms. Burnes intended this to mean she and her agency, TGC, for which she held ostensible authority, were offering to work with agents of UTA to provide professional services for Mr. Hay and Ms. Bolonik with regard to TV/film negotiations.

33. At the conference call the next day, Mr. Hay explicitly gave his authorization to agents Ms. Burnes, Ms. Duffy and Mr. Richman (the "Agents") to provide professional services,

on his behalf, regarding bids from and negotiations with TV and movie producers.

34. The Agents, including Ms. Burnes, stated that his oral authorization was sufficient, that a written document was not necessary, and that such formalities would be handled later, when negotiations with the winning bidder were complete, that they would charge him and Bolonik at their standard rate, which would be the same percentage of the contract value that they charged their other clients, and that in the meantime, the agents would seek the best possible deal for him and Ms. Bolonik, which they said would likely be completed within a few months.

35. The Agents, including Ms. Burnes, intended this to mean they and their agencies, TGC and UTA, for which they held ostensible authority, considered themselves bound to an agreement to provide professional services for Mr. Hay and Ms. Bolonik with regard to TV/film negotiations, and that Mr. Hay was similarly bound.

36. Mr. Hay understood from this that the Agents, including Ms. Burnes, considered themselves bound to an agreement to provide professional services to him with regard to film/TV negotiations.

37. After the call, Ms. Duffy and Mr. Richman wrote to Ms. Burnes, Mr. Hay, and Ms. Bolonik, stating that they were now part of "your team," and providing their professional judgment regarding the project.

38. Duffy and Richman intended this to mean that they had agreed to be part of Mr. Hay's team to provide professional services to locate suitable potential bidders and to negotiate on behalf of Mr. Hay.

39. In the weeks and months that followed, the team fielded inquiries and offers from 10-20 producers, advised Plaintiff which ones were worth pursuing, negotiated regarding the

6

terms of proposed contracts, and made presentations to movie and television studios.

40. Defendants repeatedly indicated to Plaintiff, the producers, the studios, and others that they were acting as Plaintiff's agents.

41. On several occasions, Ms. Burnes provided professional instructions to Plaintiff regarding the potential deals, including that he should not deal directly with producers who contacted him, but should instead refer the producers to her and the others on the team.

42. For example, in November 2019, upon hearing from Plaintiff that a producer had reached out to him, Ms. Burnes wrote to him that he should contact the producer and ask him to contact Ms. Burnes.

43. Ms. Burnes engaged in daily and weekly communications with Plaintiff via Ms. Bolonik about the work of the team.

44. In Spring 2020, Ms. Burnes and the team reached a deal with a television producer on behalf of Plaintiff, which they submitted to him for his signature.

**The Book Deal**

45. During the writing of the article during early 2018, Ms. Bolonik communicated to Plaintiff a desire that she make use of Plaintiff's writings on the events of his life, that he supply materials regarding his life, and that he provide her with his interpretation of the events.

46. During the writing of the article, Ms. Bolonik communicated to Plaintiff that he played a central role in the writing of the book.

47. In the Spring and early Summer of 2019, Ms. Bolonik proposed to Plaintiff that they write the book together, and be credited as coauthors, or, in the alternative, that she would

write the book herself, based on the Plaintiff's writings regarding the events of his life, materials he supplied regarding the events of his life, and his interpretations of the events.

48. Ms. Burnes was aware of these conversations.

49. On the day of the conference call (July 26, 2019) in which Plaintiff agreed to be represented by TGC and UTA (¶ 28-33 above), Ms. Bolonik wrote to Plaintiff, stating that she had spoken to Ms. Burnes about a book project and received a favorable reception.

50. In August 2019, Ms. Burnes helped Ms. Bolonik write a proposal for a book based on the article, to be authored solely by Ms. Bolonik, and began circulating it to publishers.

51. Ms. Burnes did not inform Plaintiff of these actions.

52. In early September 2019, Ms. Bolonik informed Plaintiff that she had entered into contract with HarperCollins, under which she (as sole author) would expand the article into a book.

53. Plaintiff informed Ms. Bolonik and Ms. Burnes that he would resume work on a memoir of his own.

54. In late September 2019, Ms. Burnes spoke to Plaintiff about his ideas for a memoir.

55. Ms. Burnes discouraged Plaintiff from continuing to write a memoir with the motivation that, upon information and belief, she wished to favor Ms. Bolonik's book project over Mr. Hay's book project. Ms. Burnes assured Mr. Hay when she discussed his memoir that she viewed him as an integral part of Bolonik's book and she would protect his interests with respect to it. She suggested that she viewed him as a co-author, but silent for strategic reasons.

56. She told Plaintiff that she would not represent his book project and that he should postpone writing the memoir for a "couple of years."

**Defendants' Continued Association with Ms. Bolonik's Book Project**

57. On June 13, 2020, Plaintiff sent Ms. Burnes a letter detailing concerns about the accuracy of Ms. Bolonik's representation of his life story based on information he had learned about the attempts of other unscrupulous actors to manipulate him into creating pseudological stories about the Shumans. He requested that Ms. Burnes and TGC disassociate themselves from the book and TV/film projects.

58. Neither Ms. Burnes nor TGC investigated or took any action based on Plaintiff's information.

59. In May 2021, counsel for Plaintiff wrote a letter to Gernert, in which counsel pointed out that having become Plaintiff's agent in July 2019, Defendants owed Plaintiff certain fiduciary duties to Plaintiff that they had breached and continued to breach by continuing to associate themselves with the book and TV/film projects to the detriment of Plaintiff.

60. TGC responded by asserting incorrectly that it had never represented Plaintiff, and always represented Ms. Bolonik alone, that the discussions regarding representation of Plaintiff were solely directed to UTA, and that Ms. Burnes' discussions with Plaintiff regarding the book projects were "gratuitous advice."

61. Defendants continue to associate themselves with Ms. Bolonik's book and film projects based on Plaintiff's life story, and to promote these to the detriment of Plaintiff.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**Breach of Fiduciary Duty**
**[AGAINST DEFENDANTS TGC AND BURNES]**

62. Plaintiff repeats and re-alleges each of the foregoing paragraphs.

63. Plaintiff and Defendants agreed that for the purposes of presenting Plaintiff's life story to potential purchasers, TCG, acting through its agent Ms. Burnes, would have authority to act on behalf of Plaintiff in initiating a relationship between Plaintiff and Film/TV producers, and that Burnes and TGC would be subject to the direction and control of Plaintiff in carrying out this duty.

64. By virtue of this agreement, Defendant Burnes on behalf of TGC represented Plaintiff.

65. By virtue of this agreement, Defendants Burnes and TGC owed Plaintiff a fiduciary duty.

66. TGC owed Plaintiff a fiduciary duty of good faith and loyalty not to do anything which would interfere with Plaintiff's rights to his life story.

67. Defendant Burnes was aware that Ms. Bolonik had asked Plaintiff to co-author the book project regarding his life story, or to provide substantial assistance in exchange for a life story agreement.

68. Defendant Burnes was aware that Plaintiff had provided substantial assistance, but no life story agreement was forthcoming.

69. Defendant Burnes, on information and belief, discouraged Ms. Bolonik from including Plaintiff as co-author.

70. Ms. Burnes discouraged Plaintiff from continuing to write his memoir with the motivation that, upon information and belief, she wished to favor Ms. Bolonik's book project over Mr. Hay's book project.

71. Plaintiff and Defendants agreed that for the purposes of pitching the film, Burnes and Gernert would have authority to act on behalf of Plaintiff in initiating a relationship between

Plaintiff and TV/film producers, and that Defendants would be subject to the direction and control of Plaintiff in carrying out this duty.

72. TGC has breached its fiduciary duties of good faith and loyalty by engaging in the acts set forth above.

73. These breaches of fiduciary duty have damaged Plaintiff in an amount of not less than $75,000.

## PRAYER FOR RELIEF

Plaintiff requests damages not less than $75,000 to be determined at trial, together with costs, interest, and such other relief as the Court finds just and proper.

January 26, 2022

Respectfully submitted,

   s/ Jillian T. Weiss
Jillian T. Weiss   (JW 4542)
Law Office of Jillian T. Weiss, P.C.
226 Prospect Avenue West, #104
Brooklyn, New York 11215
New York, NY 11232
Tel: (845) 709-3237
Fax: (845) 684-0160
jweiss@jtweisslaw.com