UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                            :

BRUCE HAY,                            :

                                 :

                         Plaintiff,    :            22 Civ. 698

                                 :

             -against-           :       **OPINION AND ORDER**

                                 :

THE GERNERT COMPANY, INC., et al.,   :

                                 :

                      Defendants. :
-----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

       Plaintiff Bruce Hay brings this action against Defendants The Gernert Company, Inc. ("TGC") and Sarah Burnes, alleging breach of fiduciary duty. Defendants move to dismiss the Amended Complaint (the "Complaint") under Federal Rule of Civil Procedure 12(b)(6). For the reasons below, the motion is granted.

## I.    BACKGROUND

       The following facts are taken from the Complaint. *See Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021). They are assumed to be true for purposes of this motion. *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022).

       Defendant TGC is a literary agency that partners with subagents in the film and television industries. Defendant Burnes is a literary agent and principal of TGC. Plaintiff was a professor at Harvard Law School and the subject of two articles published in *New York* magazine, the substance of which underlies this case.[1]

---

[1] *See* Kera Bolonik, *The Most Gullible Man in Cambridge*, NEW YORK (July 23, 2019), https://www.thecut.com/2019/07/bruce-hay-paternity-trap-maria-pia-shuman-mischa-haider.html; Kera Bolonik, *The Harvard Professor Scam Gets Even Weirder*, NEW YORK (Aug.

**The Media Negotiations**

Plaintiff shared his life story with his acquaintance Kera Bolonik in June 2018.  Bolonik was a freelance writer and part-time employee at *New York* magazine.  She published the two articles about Plaintiff in July and August 2019.

Soon after the first article was published, Bolonik and Burnes received inquiries from movie and television producers.  Bolonik told Plaintiff, with the encouragement and approval of Burnes, that: (1) Burnes had informed her that a Hollywood production would require the joint participation of Bolonik and Plaintiff; (2) Burnes had expressed interest in helping them jointly negotiate the deal; (3) Burnes proposed working with United Talent Agency ("UTA") and (4) Burnes promised that TGC and UTA would make a great team for negotiating the best possible deal for Plaintiff and Bolonik.  Plaintiff understood from this that Burnes, on behalf of TGC, was offering to represent him in regard to film and television negotiations.

Shortly thereafter, Bolonik emailed Plaintiff and Burnes to discuss managing the film and television rights with Jason Richman and Addison Duffy of UTA.  On a conference call the following day, Plaintiff authorized Burnes, Duffy and Richman to provide professional services on his behalf, regarding bids from, and negotiations with, television and movie producers.  They, including Burnes, stated that Plaintiff's oral authorization was sufficient, that a written document was not necessary and that such formalities would be handled later, when negotiations with the winning bidder were complete.  Plaintiff and Bolonik would then be charged the standard rate: the same percentage of the contract value that TGC and UTA charged their other clients.  After the call, Duffy and Richman wrote to Burnes, Plaintiff and Bolonik, stating that they were now

---

8, 2019), https://www.thecut.com/2019/08/bruce-hay-paternity-trap-maria-pia-shuman-mischa-haider-follow-up.html.

part of "your team."  Plaintiff understood from this that Burnes, Duffy and Richman considered themselves bound to an agreement to provide professional services to him with regard to film and television negotiations.

In the following weeks, Duffy, Richman and Burnes fielded offers from multiple producers and negotiated contracts on Plaintiff's behalf.  On at least two occasions, including August 27, 2019, and January 23, 2020, Burnes wrote to Plaintiff, indicating that she would participate in discussions with UTA regarding his life rights, among other topics.  On November 12, 2019, Burnes emailed Plaintiff to advise that she had spoken to the UTA representative regarding a potential film and television deal.  On November 26, 2019, Burnes emailed Plaintiff about providing her contact information to those expressing interest in producing his story.

During this time, Defendants indicated to Plaintiff, the producers, the studios and others that they were acting as Plaintiff's agents.  Burnes engaged in daily and weekly communications with Plaintiff through Bolonik and, on several occasions, instructed Plaintiff not to deal directly with producers who contacted him and instead refer the producers to her and others on the team. In the spring of 2020, Burnes and the team reached a deal with a television producer on behalf of Plaintiff, which they submitted to him for his signature.

**The Book Negotiations**

In the spring and early summer of 2019, Bolonik proposed to Plaintiff that they write a book together and be credited as co-authors, or that she would write the book herself, based on Plaintiff's writing regarding the events of his life, materials he supplied and his interpretations of the events.  Burnes was aware of these discussions.  On May 14, 2019, Plaintiff wrote to Burnes:

> I've given some thought to this project since our call and like the plans you have for it.  I also think it makes sense to wait till [Bolonik's] article comes out so we know which direction to take this in.  [Bolonik] has given me some pointers about what to work on.

3

In response, Burnes wrote:

> B! I'm glad we connected and that we are on the same page.  [Bolonik] has also
> been thinking about a joint book.  Whether you want to co-author with her or work
> on something solo like a memoir, I'm happy to work with you . . . . Rest assured
> anything you send me will remain confidential.  I won't share anything without
> your permission.

Plaintiff understood this to mean that the project would entail his own memoir, a memoir together
with Bolonik or both.

Around two months later, Bolonik wrote to Plaintiff, stating that she had spoken to Burnes
about the book project and received a favorable reception.  Plaintiff was promised half of the
proceeds from the sale of the book.

In August 2019, Burnes helped Bolonik write a book proposal based on the article, to be
authored solely by Bolonik, and began circulating it to publishers.  Burnes did not inform Plaintiff
of these actions.

In early September 2019, Bolonik informed Plaintiff that she had entered into a contract
with HarperCollins, under which she, as sole author, would expand the article into a book.
Plaintiff informed Bolonik and Burnes that he would resume work on a memoir of his own.

In late September 2019, Burnes spoke to Plaintiff about his ideas for a memoir.  She
discouraged Plaintiff from continuing to write the memoir because she favored Bolonik's book
project, told Plaintiff that she would not represent his book project and encouraged him to
postpone writing the memoir for a couple of years.  At present, Defendants continue to associate
themselves with Bolonik's book and film projects based on Plaintiff's life story, and to promote
these to the detriment of Plaintiff.

## II.     STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted).  To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *accord Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ] [plaintiff's] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Bensch v. Estate of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).  To survive dismissal, "plaintiffs must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019) (alteration in original) (internal quotation marks omitted).

New York law governs this dispute because the parties' submissions assume that it does. *See In re Snyder*, 939 F.3d 92, 100 n.2 (2d Cir. 2019) ("[I]mplied consent is . . . sufficient to establish the applicable choice of law . . . ." (internal quotation marks omitted)).

## III.     DISCUSSION

Defendants argue that the Complaint should be dismissed for failure to state a claim as (i) the alleged fiduciary duties arise out of agreements that are facially void, (ii) Defendants do not

owe Plaintiff any fiduciary duty independent of the alleged agreements, (iii) the Complaint does not plead any acts of Defendants' breaching their alleged fiduciary duties and (iv) the Complaint does not plead that Defendants' alleged breaches caused the injuries for which Plaintiff seeks to recover.  As explained below, the Complaint fails to state a viable claim for breach of fiduciary duty.

### A.  Fiduciary Duty -- Applicable Law

The elements of a breach of fiduciary duty claim under New York law are: (1) the existence of a fiduciary duty; (2) knowing breach of that duty; and (3) damages directly caused by such breach.  *Matter of Caton*, 168 N.Y.S.3d 860, 860 (2d Dep't 2022).

A fiduciary relationship is established "between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."  *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) (internal quotation marks omitted); *accord Lynch v. Nat'l Prescription Adm'rs, Inc.*, 795 F. App'x 68, 69 (2d Cir. 2020) (summary order) (applying New York law).  "Put differently, a fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other."  *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 980 (N.Y. 2009) (cleaned up); *accord Blanton v. Educ. Affiliates, Inc.*, No. 21 Civ. 1221, 2022 WL 1505124, at *4 (2d Cir. May 12, 2022) (applying New York law).  Whether there is a fiduciary relationship is fact specific and results from the parties' relation and ongoing conduct.  *Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 79 (1st Dep't 2005).  Even when the parties have a contractual relationship, "a cause of action for breach of fiduciary duty may survive, for pleading purposes, where the complaining party sets forth allegations that, apart from the terms of the contract, the

[contracting parties] created a relationship of higher trust than would arise from the . . . agreement alone." *EBC I, Inc.*, 832 N.E.2d at 31 (finding a fiduciary relationship sufficiently pleaded where issuer relied on underwriter's knowledge and expertise in an IPO, though the underwriting contract itself did not create the relationship). A fiduciary's liability "is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." *Sergeants Benevolent Ass'n Annuity Fund*, 796 N.Y.S.2d at 79 (internal quotation marks omitted).

"[I]t is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." *Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y. 1989). This duty bars "not only blatant self-dealing, but also requir[es] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Id.* at 576; *accord United States v. Marin*, No. 18 Civ. 9307, 2020 WL 378094, at *6 (S.D.N.Y. Jan. 23, 2020) (applying New York law). Once a fiduciary relationship is established, a fiduciary must act for the benefit of another on all matters within the scope of their relationship. *See United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016) (applying New York law).

A party claiming that he has been damaged by the actions of his fiduciary must also plead that the alleged breach was "the direct and proximate cause of the losses claimed." *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (1st Dep't 2002); *accord Endico v. Endico*, No. 19 Civ. 7231, 2022 WL 3902730, at *9 (S.D.N.Y. Aug. 30, 2022) (applying New York law).

**B.  Existence of a Fiduciary Duty**

The Complaint alleges sufficient facts to show that Defendants owed Plaintiff a fiduciary duty over and above, or independent of, any contractual obligations that existed. Defendants, who by trade are literary agents, agreed to act in that role on behalf of Plaintiff.  By its nature, this is a fiduciary relationship.  *See, e.g.*, *Friedman v. Kuczkir*, 272 F. Supp. 3d 613, 618 (S.D.N.Y. 2017) (finding that "[a] literary agent has a fiduciary duty to the agent's client and is required to act in the best interests of the client"); *see also* Restatement (Third) of Agency § 1.01 cmt. e (Am. L. Inst. 2006) (defining agency as a "fiduciary relationship").

From the outset, Defendants worked closely with Plaintiff and promised that TGC and UTA would make a great team for negotiating the best possible deal for Plaintiff and Bolonik.  In the months that followed, the parties communicated on a daily and weekly basis, where Defendants provided professional instructions to Plaintiff, advised him on which offers from the ten to twenty producers were worth pursuing and encouraged him to not deal with the producers directly and to instead refer them to Burnes and those at UTA.  Defendants also repeatedly indicated to Plaintiff, the producers, the studios and others that they were acting as Plaintiff's agents.  Such actions and representations induced Plaintiff to rely on Defendants' expertise in the book and film industries -- on the belief that Defendants would advise him on the best possible deal and would engage in honest and fair dealings with Plaintiff's best interests in mind.  These allegations are sufficient to show that Defendants were "under a duty to act for or to give advice for the benefit of [Plaintiff] upon matters within the scope of the relation." *EBC I, Inc.*, 832 N.E.2d at 31.

Defendants argue that they owed Plaintiff no fiduciary duty, in part, because the alleged agreements were void or otherwise unenforceable.  The argument, however, misconceives the duty.  Although the Complaint suggests that Defendants owed Plaintiff a fiduciary duty "by virtue of [the] agreements," the Complaint alleges a breach of fiduciary duty claim rather than a breach of contract claim.  As the *EBC I, Inc.* case makes clear, that duty arises from the relationship between the parties -- from a higher level of trust and reliance on the other's advice, expertise and knowledge -- and does not depend on the terms or enforceability of their agreement.  As explained above, the Complaint sufficiently pleads facts that give rise to Defendants' fiduciary obligations.

### C.  Breach of Duty

The Complaint plausibly alleges that Defendants breached their fiduciary duty by interfering with Plaintiff's rights to his life story and acting against his best interests. Specifically, the Complaint alleges that Defendants represented both Plaintiff and Bolonik as clients, thereby creating a situation of conflict in negotiating a book deal for them both.  To Plaintiff's detriment, Burnes helped Bolonik write a proposal for her book, discouraged Bolonik from including Plaintiff as a co-author and discouraged Plaintiff from continuing to write his memoir.  Burnes also helped Bolonik circulate her book proposal to publishers without telling Plaintiff.  By putting the interests of Bolonik ahead of Plaintiff's, Defendants breached their "duty of undivided and undiluted loyalty" to Plaintiff.  *Birnbaum*, 539 N.E.2d at 576.

Defendants argue that the Complaint "alleges breach in vague and conclusory terms without providing any factual support for its characterizations of Defendants' actions."  Drawing all inferences in favor of Plaintiff as the non-moving party, the facts

above are sufficient to support the claim that Defendants did not act for, or give advice

for the benefit of, Plaintiff upon matters within the scope of their relation. *See Halloran*,

821 F.3d at 338.

### D.  Resulting Damages

The Complaint fails to allege facts that plausibly show damages caused by

Defendants' breach.  The Complaint alleges that Defendants breached their fiduciary

duties "with regard to both the book deal and the TV/film deal" and implies that as a

result, Plaintiff lost his promised half of the proceeds of either deal.  But the Complaint's

allegations do not plausibly show that there were any lost proceeds, and even if there

were, that the loss was caused by Defendants.

As to the book deal, (i) the competing book was never written by Bolonik, or at

least it has not been published, (ii) no one is preventing Plaintiff from writing and

shopping his memoir and (iii) even if Burnes had disclosed to Plaintiff that she helped

Bolonik with a book proposal and circulated it to publishers, or even if she had refrained

from helping Bolonik in that way, the Complaint fails to articulate what Plaintiff would

have had that he does not have now.  Even assuming some causal relationship -- that if

Burnes had promoted Plaintiff rather than Bolonik on the book project -- Plaintiff's

damages are still entirely speculative.  It is unknown whether and what Plaintiff would

have written, whether a publisher would have accepted it, whether readers would have

purchased it and what if any proceeds it would have earned.  That Plaintiff was promised

half of the proceeds of a hypothetical book is insufficient to support a claim for damages.

The alleged harm from the potential media deal is even less clear.  The Complaint

alleges that, in the spring of 2020, Defendants reached a deal with a television producer

on behalf of Plaintiff, which they submitted to him for his signature.  The Complaint does

not allege why the media deal failed, let alone how its failure was caused by Defendants'

alleged breach.  Plaintiff's argument that the Complaint "clearly state[s] the damages to

Plaintiff" because he was promised half of the profits of a potential book and media deal,

without more, is unavailing.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is **GRANTED**.  Defendants'

request for an oral argument is **DENIED** as moot.  By February 8, 2023, should Plaintiff wish to

seek leave to replead consistent with this opinion, he may file a letter, not to exceed three pages,

requesting to file an amended complaint and explaining how the proposed Second Amended

Complaint cures the deficiencies identified above.  If Plaintiff does not file the letter, the Court

will enter final judgment of dismissal and direct the Clerk of Court to close this case.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 32 and 35.

Dated: January 25, 2023
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE