**LAW OFFICE OF JILLIAN T. WEISS, P.C.**
ATTORNEY AT LAW
226 PROSPECT PARK WEST, NO. 104
BROOKLYN, NEW YORK 11215
------------
(845) 709-3237
jweiss@jtweisslaw.com

February 8, 2023

Dear Judge Schofield:

  In response to your Opinion and Order dated January 25, 2023, Plaintiff Bruce Hay submits this letter requesting leave to amend his Complaint and explaining how the amendments will cure the shortcomings identified in your ruling. The Opinion and Order concludes the Complaint fails to plausibly allege damages other than the "entirely speculative" loss of "half of the proceeds of a hypothetical book" co-authored by Plaintiff and Bolonik. Opinion and Order at 10. The amendments to the Complaint below, if allowed, will demonstrate concrete and tangible damages directly resulting from Defendants' breach, in several respects.

**1.**  *Bolonik's Book is Being Publicized as Forthcoming*
  Contrary to the Opinion and Order's assertion (p. 10) Bolonik's "competing book "was never written" or at least has not been published, there is no reason to believe the book has not been written or will not be imminently published by HarperCollins. The book deal was announced in a trade publication and the announcement was shared by Bolonik on social media in September 2019. In the years since signing her book deal with HarperCollins, Bolonik has maintained on her public profiles her book is forthcoming from HarperCollins/Dey Street and there has been no information or announcement leading anyone to believe otherwise. Bolonik described to Plaintiff in 2019 HarperCollins' reaction to legal outreach by the Shuman's counsel as "weak sauce" because HarperCollins expressed concerns about the book deal to her, and then Bolonik told Plaintiff the New York Magazine's lawyer David Korzenik "got on the phone with the weasels at HarperCollins" and told them to pursue the book deal. Bolonik told Plaintiff Korzenik was successful in persuading HarperCollins to move forward with the book deal. Bolonik disclosed to Plaintiff in 2020 she was paid a large advance by HarperCollins, and which Bolonik claimed promised to publish upon delivery of the manuscript. In a press interview in 2020, Bolonik also stated she had signed a book deal. In 2020, Bolonik told Plaintiff she was conducting interviews for her book and she was traveling for those interviews and the travel was covered by her book advance. In fact Bolonik traveled to meet with Plaintiff and his lawyer in 2020 and stated the travel expenses were covered by the "generous book advance" paid to her by HarperCollins. HarperCollins has not publicly disavowed the book or canceled the contract, despite public reporting in national media reporting on Bolonik's reportorial misconduct, sexual harassment of Plaintiff, and the failings of the *New York Magazine* articles on which the book deal is based. In fact, HarperCollins has confirmed to Plaintiff Bolonik is still writing the book and Plaintiff has been informed by HarperCollins the book is moving forward. Plaintiff has heard, from several individuals in the past year, Bolonik has been contacting them for interviews for her forthcoming book. Bolonik created a social media profile in November 2022 in which she included the announcement that her book is forthcoming. In her other social media postings and in a press interview, Bolonik also touts the book as forthcoming. The deal as it stands already represents significant damages to the Plaintiff because he was led to believe by Burnes this was a joint project and would be jointly remunerated as such. In an exchange with Burnes where Plaintiff asked her about material Plaintiff was providing to Bolonik, she assured him "the beauty of coauthoring with Kera" meant there would not be "haggling" amongst them over the scope of each

project and Plaintiff could share his story and materials with Bolonik freely since he would be an equal participant in the book should he so choose. Yet Burnes, by her own admission to Plaintiff soon after the book deal was announced in the press, worked with Bolonik to finalize a deal based on material and interviews provided by Plaintiff. Burnes had induced Plaintiff to do so with the explicit assurances aforementioned from Burnes, who was his agent, he should "feel free" to share anything with Bolonik, her other client, because if he so chose, the book deal would be joint. However, Burnes and the Gernert Company deprived him of choice they promised him when secretly negotiating a book deal for Bolonik alone. Bolonik has already been paid an advance which should have been shared with him and which amounts to quantified damages. These are significant demonstrable damages the case for which would be pled in an amended complaint and through discovery it will become possible to prove both the extent of the damages and the intention of Defendants to defraud Plaintiff and betray their fiduciary relationship with him to extract from him all to help their other client, Bolonik, secure a book deal at his expense.

**2.    No Publishing House Will Take on a Rival Project by Plaintiff**
Although the Opinion and Order's states (p. 10) "no one is preventing Plaintiff from writing and shopping his memoir," the existence of Bolonik's improperly-obtained contract with HarperCollins makes it highly unlikely any publisher would be interested in purchasing a rival book on the same subject, or sales would not be adversely affected by the presence of Bolonik's book on the market. Plaintiff shared all the material and information with Bolonik and Burnes under the guise of a joint book deal. The information Plaintiff had about the subject would no longer be exclusive since Bolonik also had access to it, rendering his book essentially obsolete. Plaintiff has been informed, by several experts and agents in the industry, shopping a memoir covering the same ground as Bolonik's highly-publicized book would be fruitless. Indeed, these same experts noted the ethical issues raised by Burnes' and the agency's conduct, and advised him to request Burnes and the Gernert Company honor their fiduciary obligations toward Plaintiff, and either renegotiate the book deal with HarperCollins or cancel it so his rights to his material and story may be restored in the eyes of potential publishers they may approach on his behalf. Plaintiff approached an agent in May 2020 after informing Bolonik he would no longer work with her due to her abusive and sexually harassing conduct towards him. The agent said, referring to Burnes, "she really screwed" him because a memoir by him would be far more "appealing to the average shmoe than anything Kera can write on all this." However, since she has a book deal on the story, unless the deal is canceled "I wouldn't bother trying to shop this if I were you." They suggested reaching out to Burnes and the Gernert Company because "from where I stand, they have cost you not only your story but a lot of money too." Another agent working at a highly regarded literary agency disclosed to Plaintiff an estimate that, if Bolonik did not have this deal on the story, they would be able to shop it around and expect "high sixes to low sevens" as the amount publishers would be willing to pay him. Experts consulted cited the existence of Bolonik's book deal, without it having been negotiated as a joint deal or as a joint deal of two books, as the main reason Plaintiff's efforts to obtain a deal for his memoir were bound to fail. They also stated that, by Burnes and Gernert not delineating the scope and respective boundaries of each of their clients' projects, Bolonik obtained much of the material which was his to share in a memoir. Plaintiff's efforts in pursuing a book deal of his own were precluded by the harm Burnes and Gernert's violation of their fiduciary duties had inflicted on him.

**3.	The Forthcoming Bolonik Book Contributed to Ending Plaintiff's Career at Harvard**

Bolonik's *New York Magazine* articles, published in summer 2019, caused much embarrassment to Harvard University. In an effort to smooth things over with his employer, Plaintiff informed Harvard he was working with the journalist and a book agent to write a memoir that would include an in-depth, responsible account of the events. Once HarperCollins purchased Bolonik's book rights in September 2019, word spread quickly through the Harvard administration and faculty that the articles were to be expanded into a book and Plaintiff would not be jointly authoring it, as many previously thought. Plaintiff was in touch with several administrators at Harvard who were arranging for him to resume teaching and said all was on track to have him back in the classroom. They abruptly changed course, however, once her book deal was announced in the press and they became aware of this. A colleague asked him "So you're not coauthoring the book? How come?" alluding to concerns regarding further negative attention on Harvard. Soon after the book deal was announced, someone in an administrative position at Harvard warned Plaintiff the articles were already a problem, though Plaintiff's career would "survive them," but now Plaintiff was not writing the book or involved in the book deal at all, it raised concerns among the administration about whether he could remain on the faculty there to avoid further embarrassment to Harvard. Plaintiff was told by two colleagues they had been informed deans and other decision makers at Harvard Law School and the broader university decided it was imperative to detach Hay from Harvard — so when the book came out, the "embarrassing" Bruce Hay would no longer worked there. As a tenured professor, they could not fire him without taking certain steps. Deans, however, have broad powers in taking disciplinary steps. In the fall of 2019, a group of deans and other decision makers devised a pretextual set of "charges" against Hay, either entirely groundless or acts of carelessness now being recast as serious offenses, and had never before been mentioned as the possible subject of formal proceedings. These "charges" were pretextual because the university had been aware of all of them for years and only decided to pursue disciplinary action against Plaintiff shortly after the announcement of the book deal and their expressed consternation. In the months following, it became clear to Plaintiff, because of these and similar facts, he was being tried by people who had made up their minds to get rid of him. Several colleagues of his told him in 2020 they had heard from administrators that Plaintiff could no longer remain on the faculty, now that a book was being written "on him" and not "by him" about the saga; these colleagues said to him it is best he resign because, based on what they heard from administrators, their intent was to ensure there was no chance of him remaining on the faculty. Plaintiff shared this information with Bolonik shortly after learning it. During Plaintiff's resignation decision-making, his interlocutor at the university's Office of General Counsel made clear to him, should he not resign, the disciplinary steps being taken against him would most likely lead to his termination at Harvard. Feeling any reasonable person would take retirement as the vastly better option, he retired from his position — losing years of future income from a job from which he took great satisfaction and in which as a tenured faculty member he would have stayed if it had not been for Defendants, who cut him out of the deal.

These allegations will amply support a measure of quantifiable, economic, non-reputational damages for the harms caused by the Defendants. Plaintiff respectfully requests the Court grant leave for Plaintiff to amend his Complaint.

Respectfully,
s/ Jillian T. Weiss