UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRUCE HAY<br><br>               Plaintiff,<br><br>v.<br><br>THE GERNERT COMPANY, INC., and SARAH BURNES,<br><br>               Defendants. | Civil Action No. 1:22-cv-698<br><br>**SECOND AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

**PRELIMINARY STATEMENT**

1.　　This is a diversity action based on breach of fiduciary duty.

2.　　Over the past decade, the digital revolution has eroded earnings throughout much of the publishing industry. Newsrooms have sustained mass layoffs; magazines and publishing houses have shut down; sales of books, in both print and electronic formats, have stagnated. Between 2009 and 2019 the average advances and royalties paid to book authors fell by some 30 percent. (See Léon, Does It Pay to Be a Writer? N.Y. Times, January 5, 2019.)

3.　　During this same period, publishers have come to rely on sensational "blockbusters" to make money. According to prominent literary agent David Gernert, the book market is increasingly dominated by the "brand-name bestseller," with the result that "the rich

1

get richer and everybody else goes about their business." (Quoted in Gamerman, The Year of the Blockbuster Novel, Wall St. Journal, May 28, 2017.)

4.      This precarious, winner-take-all environment has tempted some in the publishing industry to cut legal and ethical corners in pursuit of the next bestseller. The present case arises out of the decision of Gernert's own agency, known as the Gernert Company ("TGC") – together with its agent Sarah Burnes ("Burnes") to succumb to that temptation.

5.      Defendant Sarah Burnes, a literary agent, on behalf of Defendant The Gernert Company ("TGC"), a literary agency, entered into an agreement with Plaintiff Bruce Hay to negotiate book, television and film deals on his behalf with regard to previously written articles the major subject of which was Mr. Hay's life.

6.      Ms. Burnes, on behalf of TGC, then negotiated deals with HarperCollins Publishers LLC that cut out Mr. Hay entirely, breaching the fiduciary duties of Ms. Burnes and TGC to Mr. Hay.

7.      The Defendants also negotiated deals regarding with and certain film/TV producers for depictions of Mr. Hay and Mr. Hay's life without his permission in violation of New York Civil Rights Law § 50.

**PARTIES**

8.      Bruce Hay is an individual and a citizen of Massachusetts. He was a professor at Harvard Law School during times relevant to this action

9.      TGC is a New York corporation in business as a literary agency, whose principal place of business is New York, New York.

10.     Sarah Burnes is an individual and a citizen of New York. She is an agent at the

Gernert Company, where she has been employed since 2005.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), because the Plaintiff's citizenship at the time of filing was diverse from that of each Defendant, and because the amount in controversy exceeds $75,000.

12.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred in the Southern District of New York.

## FACTS

13.     Defendant TGC is a literary agency that partners with subagents in the film/TV industry.

14.     Defendant Sarah Burnes is a literary agent and principal of TGC.

15.     Plaintiff Bruce Hay was a professor at Harvard Law School, who was the subject of articles published in New York Magazine in July 2019.

16.     The articles concerned Mr. Hay's conflict with two formerly close friends: Maria-Pia Shuman, a cisgender white woman, and her spouse Mischa Shuman, a transgender woman of color ("the Shumans").

17.     They were drawn into legal conflict in 2017. Mr. Hay was contacted by individuals with a grudge against the Shumans, and their lawyers, who intentionally misled him to believe the Shumans were committing fraud.

18.     In June 2018, Mr. Hay first described the situation to his acquaintance Kera Bolonik ("Ms. Bolonik"), a freelance writer and part-time employee at *New York* Magazine.

19.     Ms. Bolonik wrote two articles regarding Plaintiff's life in New York Magazine

in July and August of 2019.

20. Ms. Bolonik subjected Mr. Hay to sexual harassment during the course of his working with her on the articles, and TGC was on notice of this but took no action.

21. In December 2019, Ms. Burnes agreed with Plaintiff to negotiate the sale of Plaintiff's life rights to a movie or television producer in exchange for his consent to a Life Rights Agreement for the use rights of his life story by TGC. Plaintiff was promised half of the proceeds from the sale.

22. Ms. Burnes told him that she was partnering with Gernert's subagent United Talent Agency for purposes of his representation.

23. In late 2019, after the articles were already published, Mr. Hay began to realize the harm caused by Bolonik and several other persons and their attorneys with a grudge against the Shumans, and how they had manipulated him into fueling pseudological stories about the Shumans.

24. Several men, claiming to be the victims of the Shumans' alleged fraud, had, in fact, victimized the Shumans. In order to avoid the legal consequences, they falsely accused the Shumans of criminal misbehavior. They and their lawyers provided false and selective evidence to Mr. Hay to encourage him to also accuse the Shumans of wrongdoing.

25. The articles were published in July and August 2019. In April 2020, Mr. Hay contacted Ms. Bolonik and her publisher, New York Media LLC, about the evidence he had received about the issue. He wrote to New York Magazine through July 2020, when he filed his lawsuit against New York Magazine requesting them to remove the articles, but the publisher continued to publish them by allowing them to remain online.

26. As soon as the first article was published in July 2019, Ms. Bolonik and Ms. Burnes began receiving inquiries from movie and television producers and began soliciting media deals as well because they did not receive as many inquiries as they had hoped.

27. In telephone conversations with Mr. Hay in the days after the article was published, Ms. Bolonik said the following to him with the encouragement and approval of Ms. Burnes: (1) that Ms. Burnes had informed her that a Hollywood production would require the joint participation of Ms. Bolonik (as author) and Plaintiff (as a person being portrayed); (2) that Ms. Burnes had expressed interest in helping them jointly negotiate the deal; (3) that Ms. Burnes proposed working with United Talent Agents (UTA), with whom Gernert had a longstanding "affiliation"; and (4) that Ms. Burnes promised that Gernert and UTA would make a great "team" for negotiating the best possible deal for Mr. Hay and Ms. Bolonik.

28. Ms. Burnes intended this to mean she and her agency, Defendant TGC, for which she held ostensible authority, offered to represent Mr. Hay and Ms. Bolonik with regard to TV/film negotiations.

29. Mr. Hay understood from this that Ms. Burnes, on behalf of TGC, was offering to represent him in regard to film/TV negotiations.

30. Shortly afterward, Ms. Bolonik sent an email to Mr. Hay and Ms. Burnes, with the purpose of beginning discussions about managing the film/TV rights with Jason Richman and Addison Duffy of United Talent Agents, introducing Mr. Hay to the UTA team.

31. Ms. Duffy responded by email, requesting that Mr. Hay participate in a conference call with Ms. Burnes and others regarding TV/film rights in order to "help manage this space on your and Kera's behalf."

32. Ms. Burnes intended this to mean she and her agency, TGC, for which she held ostensible authority, were offering to work with agents of UTA to provide professional services for Mr. Hay and Ms. Bolonik with regard to TV/film negotiations.

33. At the conference call the next day, Mr. Hay explicitly gave his authorization to agents Ms. Burnes, Ms. Duffy and Mr. Richman (the "Agents") to provide professional services, on his behalf, regarding bids from and negotiations with TV and movie producers.

34. The Agents, including Ms. Burnes, stated that his oral authorization was sufficient, that a written document was not necessary, and that such formalities would be handled later, when negotiations with the winning bidder were complete, that they would charge him and Bolonik at their standard rate, which would be the same percentage of the contract value that they charged their other clients, and that in the meantime, the agents would seek the best possible deal for him and Ms. Bolonik, which they said would likely be completed within a few months.

35. The Agents, including Ms. Burnes, intended this to mean they and their agencies, TGC and UTA, for which they held ostensible authority, considered themselves bound to an agreement to provide professional services for Mr. Hay and Ms. Bolonik with regard to TV/film negotiations, and that Mr. Hay was similarly bound.

36. Mr. Hay understood from this that the Agents, including Ms. Burnes, considered themselves bound to an agreement to provide professional services to him with regard to film/TV negotiations.

37. After the call, Ms. Duffy and Mr. Richman wrote to Ms. Burnes, Mr. Hay, and Ms. Bolonik, stating that they were now part of "your team," and providing their professional

judgment regarding the project.

38. Duffy and Richman intended this to mean that they had agreed to be part of Mr. Hay's team to provide professional services to locate suitable potential bidders and to negotiate on behalf of Mr. Hay.

39. In the weeks and months that followed, the team fielded inquiries and offers from 10-20 producers, advised Plaintiff which ones were worth pursuing, negotiated regarding the terms of proposed contracts, and made presentations to movie and television studios.

40. On at least two occasions, including August 27, 2019 and January 23, 2020, Ms. Burnes wrote to Mr. Hay, among others, indicating that she would participate in discussions with UTA regarding Mr. Hay's life rights, among other topics.

41. On November 12, 2019, Ms. Burnes emailed Mr. Hay, among others, to advise that she had spoken to the UTA representative regarding an upcoming potential film/TV deal.

42. On November 26, 2019, Ms. Burnes emailed Mr. Hay to advise that he could provide her contact information to people expressing interest in TV or film production of the story.

43. Defendants repeatedly indicated to Plaintiff, the producers, the studios, and others that they were acting as Plaintiff's agents.

44. On several occasions, Ms. Burnes provided professional instructions to Plaintiff regarding the potential deals, including that he should not deal directly with producers who contacted him, but should instead refer the producers to her and the others on the team.

45. For example, in November 2019, upon hearing from Plaintiff that a producer had reached out to him, Ms. Burnes wrote to him that he should contact the producer and ask him to

contact Ms. Burnes.

46. Ms. Burnes engaged in daily and weekly communications with Plaintiff via Ms. Bolonik about the work of the team.

47. In Spring 2020, Ms. Burnes and the team reached a deal with a television producer on behalf of Plaintiff, which they submitted to him for his signature.

**The Book Deal**

48. During the writing of the article during early 2018, Ms. Bolonik communicated to Plaintiff a desire that she make use of Plaintiff's writings on the events of his life, that he supply materials regarding his life, and that he provide her with his interpretation of the events.

49. During the writing of the article, Ms. Bolonik communicated to Plaintiff that he played a central role in the writing of the book.

50. In the Spring and early Summer of 2019, Ms. Bolonik proposed to Plaintiff that they write the book together, and be credited as coauthors, or, in the alternative, that she would write the book herself, based on the Plaintiff's writings regarding the events of his life, materials he supplied regarding the events of his life, and his interpretations of the events.

51. Ms. Burnes was aware of these conversations and spoke to Plaintiff directly about material Plaintiff had provided to Bolonik. Ms. Burnes gave Plaintiff assurances that the "beauty of coauthoring with Kera" was there would be no "haggling" amongst him and Bolonik over the scope of the projects and Plaintiff could share his story and materials freely since he would be an equal participant in the book should he so choose.

52. On May 14, 2019, Mr. Hay wrote to Ms. Burnes: "I've given some thought to this project since our call and like the plans you have for it. I also think it makes sense to wait till Kera's

article comes out so we know which direction to take this in. Kera has given me some pointers about what to work on."

53. In response, Ms. Burnes wrote the next day: "B! I'm glad we connected and that we are on the same page. Kera has also been thinking about a joint book. Whether you want to co-author with her or work on something solo like a memoir, I'm happy to work with you….Rest assured anything you send me will remain confidential. I won't share anything without your permission."

54. Mr. Hay understood this to mean that Ms. Burnes expressed that she was happy to be working with him, and that the project would entail his own memoir, a memoir together with Ms. Bolonik, or both.

55. Ms. Burnes intended by her writing to convey that she was happy to be working with him, and that the project would entail his own memoir, a memoir together with Ms. Bolonik, or both.

56. About two months later, on the day of the conference call (July 26, 2019) in which Plaintiff agreed to be represented by TGC and UTA (¶ 28-33 above), Ms. Bolonik wrote to Plaintiff, stating that she had spoken to Ms. Burnes in more detail about the book project and received a favorable reception. Plaintiff was promised half of the proceeds from the sale of the book.

57. In August 2019, Ms. Burnes helped Ms. Bolonik write a proposal for a book based on the article, to be authored solely by Ms. Bolonik, and began circulating it to publishers.

58. Ms. Burnes did not inform Plaintiff of these actions.

59. In early September 2019, Ms. Bolonik informed Plaintiff that she had entered into

contract with HarperCollins, under which she (as sole author) would expand the article into a book, which HarperCollins would publish upon receipt of the manuscript.

60. The book deal between Ms. Bolonik and HarperCollins was announced in a trade publication and shared by Ms. Bolonik on social media in September 2019.

61. Ms. Bolonik was paid a large advance by HarperCollins. She did not share the advance with Plaintiff, who received no advance from the publisher.

62. In September 2019, Plaintiff informed Ms. Bolonik and Ms. Burnes that he would resume work on a memoir of his own.

63. In late September 2019, Ms. Burnes spoke to Plaintiff about his ideas for a memoir.

64. Ms. Burnes discouraged Plaintiff from continuing to write a memoir with the motivation that, upon information and belief, she wished to favor Ms. Bolonik's book project over Mr. Hay's book project. Ms. Burnes assured Mr. Hay when she discussed his memoir that she viewed him as an integral part of Bolonik's book and she would protect his interests with respect to it. She suggested that she viewed him as a co-author, but silent for strategic reasons.

65. She told Plaintiff that she would not represent his book project and that he should postpone writing the memoir for a "couple of years."

66. In October 2019, Bolonik described to Plaintiff HarperCollins' reaction to legal outreach by the Shuman's counsel as "weak sauce" because HarperCollins had expressed concerns about the book deal to her.

67. Bolonik also told Plaintiff that NY Mag's then lawyer, David Korzenik, "got on the phone with the weasels at HarperCollins" and told them to pursue the book deal. Bolonik

10

informed Plaintiff that Korzenik had been successful in persuading HarperCollins to move forward with the book.

68. In early 2020, Bolonik disclosed to Plaintiff she was paid a large advance by HarperCollins, which Bolonik claimed they promised to publish upon delivery of the manuscript. She told him she was conducting interviews for her book and was traveling for those interviews and the travel was covered by her book advance. During that time, Bolonik traveled to meet with Plaintiff and his lawyer and stated the travel expenses were covered by the "generous book advance" she had received from HarperCollins.

69. In 2020, Bolonik stated in a press interview that she had signed a book deal.

70. In mid-2020, Plaintiff confronted Bolonik about the accuracy of her work so far — notably her demonization of the Shumans and her portrayal of his relationship with them — and in a series of phone calls told her that she needed to rethink the story, because the facts and evidence (as he pointed out) did not conform to the "true crime" model she was attempting to fit the story into. He also told her that he believed she had inappropriately manipulated him in a variety of ways. Ms. Bolonik angrily resisted Plaintiff's position, and the two ceased communicating in May 2020.

71. On June 13, 2020, Plaintiff sent Ms. Burnes a letter detailing concerns about the accuracy of Ms. Bolonik's work and her unprofessional reporting practices. He requested that Ms. Burnes and TGC disassociate themselves from the book and TV/film projects. Neither Ms. Burnes nor TGC investigated or took any action based on Plaintiff's information.

72. In March 2021, Plaintiff wrote a letter to Gernert in which counsel pointed out that having become Plaintiff's agent in July 2019, (and continuing until she disavowed her

agency by letter of March 31, 2021), Defendants owed Plaintiff certain fiduciary duties to Plaintiff that they had breached and continued to breach by continuing to associate themselves with the book and TV/film projects to the detriment of Plaintiff. TGC responded by asserting incorrectly that it had never represented Plaintiff, and always represented Ms. Bolonik alone, that the discussions regarding representation of Plaintiff were solely directed to UTA, and that Ms. Burnes' discussions with Plaintiff regarding the book projects were "gratuitous advice."

**The Book Remains Forthcoming**

73. In the years since signing her book deal with HarperCollins, Bolonik has maintained on her public profiles her book is forthcoming from HarperCollins/Dey Street and there has been no information or announcement leading anyone to believe otherwise. As late as November 2022, Bolonik created a new social media profile in which she included the announcement that her book is forthcoming. Bolonik continues to conduct interviews for the book, as Plaintiff has learned from several individuals in the past year. She maintains social media accounts in which she touts the book project and her contract with the HarperCollins publishing house. HarperCollins, meanwhile, has repeatedly refused to disavow the book or cancel the contract, despite national media coverage of Bolonik's reportorial misconduct, sexual harassment of Plaintiff and the inaccuracies of the *New York Magazine* articles on which the book deal is based. Indeed, HarperCollins has confirmed to Plaintiff on multiple occasions that Bolonik is still writing the book and that the book is moving forward.

74. The HarperCollins contract, which is the product of TGC's duplicitous behavior toward Plaintiff, has deprived him of income that he himself should earn from the deal. At the very least, as his agent TGC was obligated to negotiate for him a fifty percent share of the

substantial advance that Bolonik collected from the publisher — a readily quantified figure. The understanding between Plaintiff and Bolonik was that they would share equally in the proceeds of their joint work, and TGC flagrantly breached its duties to Plaintiff by showering its preferred client with 100% of the advance.

**Plaintiff's inability to pursue his own project due to Defendant's conduct**

75. The existence of Bolonik's improperly-obtained contract with HarperCollins makes it highly improbable that any publisher would be interested in purchasing a rival book on the same subject, or, that sales of Plaintiff's own book would not be adversely affected by the presence of Bolonik's book on the market.

76. Plaintiff shared all material and information with Bolonik under the guise of a joint deal, rendering his book essentially obsolete since the content of Plaintiff's book would no longer be exclusive.

77. In May 2020, Plaintiff approached an agent after informing Bolonik he would no longer work with her due to her abusive and sexually harassing conduct towards him. The agent said that Ms. Burnes had "really screwed" him because a memoir by him would be far more "appealing to the average shmoe than anything Kera can write on all this." However, since there was already a book deal in place, unless it was canceled, "I wouldn't bother trying to shop this if I were you."

78. The agent went on to suggest that Plaintiff reach out to Ms. Burnes and the Gernert Company because "from where I stand, they have cost you not only your story, but a lot of money too."

79. Plaintiff also spoke to another agent working a a highly regarded literary

agency who disclosed to him that if Ms. Bolonik did not have this deal on the story, the agency would be able to shop it around and he could expect an estimate of "high sixes to low sevens" as the amount publishers would be willing to pay him.

80. Plaintiff consulted with experts in the literary field and they cited the existence of Bolonik's book deal — without it having been negotiated as a joint deal or as a joint deal of two books — as the main reason that Plaintiff would fail in his efforts to obtain a book deal for his own memoir.

81. These experts also stated that, by favoring their longtime friend and client Bolonik over Plaintiff, Burnes and her colleagues deceived Plaintiff into giving Bolonik the information and written materials that would have formed the basis of his own memoir.

## CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Fiduciary Duty
### [AGAINST DEFENDANTS TGC AND BURNES]

82. Plaintiff repeats and re-alleges each of the foregoing paragraphs.

83. Plaintiff and Defendants agreed that for the purposes of presenting Plaintiff's life story to potential purchasers, TCG, acting through its agent Ms. Burnes, would have authority to act on behalf of Plaintiff in initiating a relationship between Plaintiff and book publishers, with the purpose of engaging in a book publishing deal, and that Burnes and TGC would be subject to the direction and control of Plaintiff in carrying out this duty. Plaintiff was promised half of the proceeds from the sale.

84. Plaintiff and Defendants agreed that for the purposes of presenting Plaintiff's life

story to potential film/TV purchasers, TCG, acting through its agent Ms. Burnes, would have authority to act on behalf of Plaintiff in initiating a relationship between Plaintiff and Film/TV producers, and that Burnes and TGC would be subject to the direction and control of Plaintiff in carrying out this duty. Plaintiff was promised half of the proceeds from the sale.

85. By virtue of these agreements, Defendant Burnes on behalf of TGC represented Plaintiff and owed Plaintiff a fiduciary duty to represent his interests, and a duty not to sacrifice his interests to those of a preferred client.

86. TGC owed Plaintiff a fiduciary duty of good faith and loyalty not to do anything which would interfere with Plaintiff's rights to his life story.

87. No TV/film deal was consummated, due to the fault of the Defendants.

88. Defendant Burnes, as an agent of TGC, was aware that Ms. Bolonik had asked Plaintiff to co-author the book project regarding his life story, or to provide substantial assistance in exchange for a life story agreement.

89. Defendant Burnes, on information and belief, discouraged Ms. Bolonik from including Plaintiff as co-author.

90. Ms. Burnes discouraged Plaintiff from continuing to write his memoir, to his detriment, with the motivation that, upon information and belief, she wished to favor Ms. Bolonik's book project over Plaintiff's book project, although she represented both of them.

91. TGC breached its fiduciary duties of good faith and loyalty by engaging in the acts set forth above with regard to both the book deal and the TV/film deal.

92. The breaches of fiduciary duty have led to Bolonik securing a book deal at Plaintiff's expense and Plaintiff losing out on an advance on a book deal which should have been

shared with him.

93. The harm caused by Burnes and Gernert's violation of their fiduciary duties precluded Plaintiff's efforts in pursuing a book deal of his own.

94. These breaches of fiduciary duty have damaged Plaintiff in an amount of not less than $75,000.

**PRAYER FOR RELIEF**

Plaintiff requests damages not less than $75,000 to be determined at trial, together with costs, interest, and such other relief as the Court finds just and proper.

May 26, 2023

Respectfully submitted,

  s/ Bruce L. Hay
Bruce L. Hay
1309 Beacon St., Ste 300
Brookline, MA 02446
(617) 290-5083
brucelawhay@proton.me